**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                    **Case No. 8:20-cr-00137-02-TGW**

**RAYQUAN RAINEY**

_____/

**<u>SENTENCING MEMORANDUM</u>**

COMES NOW, the Defendant, RAYQUAN RAINEY, by and through undersigned counsel and pursuant to U.S.S.G. §2D1.1(b)(18), 2D1.1, and 18 U.S.C. §3553(a), and hereby files this Sentencing Memorandum in support of a reasonable sentence, which is not greater than necessary to accomplish the purposes of sentencing, as enumerated in 18 U.S.C. §3553(a)(2). As grounds in support thereof, Mr. Rainey shows as follows:

Right before becoming a teenager, Rayquan Rainey's fragile world collapsed when a Department of Children and Families dragged him sobbing by the arm, out of his mother's home, the only home he knew. His

father had disappeared completely from his life a few years before, and never called Rayquan back, no matter how often he hopefully dialed. Without anyone else, he and his siblings went into state custody. Though his mom fought hard to change her life, winning back custody, the damage was done. It is hard to picture what true abandonment feels like to a child, alone with a stranger and state worker, taken from your only parent. It is harrowing, especially when happening to children without the mental acuity to grasp it is not their fault.

In order to attempt a fresh start with her children, Rayquan's mother moved the family to Saint Petersburg when he was nearly thirteen years old. All she wanted was a chance to start over in a new place. At first, the premise seemed to work. Rayquan made friends with another kid in the neighborhood by the name of Lennie. The two became thick as thieves, trailing each other to school and back. Rayquan's mom would often find them sitting under trees, talking and playing games. Lennie was at the Rainey family house so often, they assumed he would stay for dinner and kept extra items around for him. After the rough times, it appeared that the

move may be the right one.

But within two years Rayquan was hanging around a rougher crew. The neighborhood, the best a single mom supporting multiple children could swing, was in a rougher neighborhood. He got arrested in 2012, taking the blame to seem cool and not a "snitch." It was the wrong crew to fit into it, and he got arrested twice more in 2013. His mother hoped he would realize the crowd was bringing him down and grow out of it. She knew all about the streets from her own life and watched him make the same mistakes.

But in November 2015, the unthinkable would happen. Rayquan's mother had her godchildren visiting and called Rayquan home to spend time with family. He did not want to come home – he was hanging out with Lennie. She insisted and he came home. Two hours later, Lennie would be laying in the street where they were, surrounded by paramedics trying unsuccessfully to save his life. Lennie was pronounced dead around 8 p.m. on November 10, 2015. He was sixteen years old, shot in a robbery attempt by a 26-year-old he never met, who would not be arrested for two

more years.

Rayquan's mother fundraised to cover burial expenses that Lennie's mother could not afford alone. She watched Rayquan turn all the pain and survivor guilt inside. She watched him become more and more numb, and more and more reckless. She noticed he always seemed to be in jail around the anniversary of Lennie's birthday and his death. Rayquan was eighteen years old. He had no high school diploma. He had a criminal history already and lived in bad neighborhood. He was unemployed. His best friend was murdered in the same area he lived. If he ever had hope, he lost it then.

In June of 2019, he and his mother had a huge blowout. She knew he was hanging out with bad people, and he had been reckless in everything since Lennie's death. She warned him that she knew his path, and where it would end. Rayquan was stung and accused her of not supporting him. Following the fight, he moved out. He did not return, and she learned of his arrest in the case through a phone call from the county jail.

**Youth and Immaturity**

The offense that brings Rayquan Rainey before this Court was committed when he was 22 years old. Youth and its attendant qualities – impulsivity, immaturity, and a failure to appreciate risk are factors that the Supreme Court has identified as important in sentencing. It is now well established that teenage and young adult brains are different from more mature adult brains, and that their decision-making processes are less developed. Consequently, even when guilty of criminal offenses, young people are treated differently by the criminal justice system.

As the Supreme Court explained in *Roper v. Simmons*, 125 S. Ct. 1183, 1195-96 (2005):

> "today our society views juveniles, in the words Atkins used respecting the mentally retarded, as categorically less culpable than the average criminal . . . [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions . . . . The susceptibility of juveniles to engage in immature and irresponsible behavior means 'their irresponsible conduct is not as morally

reprehensible as that of an adult . . . [t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id*.

While in *Roper* the Supreme Court was considering defendants under the age of 18, all of the supporting literature applies equally to someone who is 22 years old, as brain development continues well into early adulthood. "Drawing the line at 18 years of age is subject . . . to the objections . . . against categorical rules." *Roper* at 574. "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id*. While 18 may be the "point where society draws the line for many purposes between childhood and adulthood," scientific developments conclude that full adulthood is not biologically achieved until much later in life than age 18. Id.

The American Psychological Association explains that difference between adolescents and adults with respect to "risk taking, planning, inhibiting impulses, and generating alternatives" is connected to "adolescent behavioral immaturity: the human brain

does not settle into its mature, adult form until after the adolescent years have passed and a person has entered into young adulthood." Brief for the American Psychological Association and the Missouri Psychological Association as Amici Curiae Supporting Respondent at 9, *Roper v. Simmons*, 543 U.S. 551 (2005) (hereinafter "Roper APA Brief"). *United States v. C.R.*, 792 F. Supp. 2d 343, 497 (E.D.N.Y. 2011). "One of the last areas of the brain to reach full maturity . . . is the part associated with regulating behavior, stifling impulses, assessing risks, and moral reasoning." Brief for the American Medical Association, et al., as Amici Curia Supporting Respondent at 16, *Roper v. Simmons*, 543 U.S. 551 (2005).

Indeed, "[m]uch of the developmental research suggests that the qualities highlighted by the Court [in Roper], described as psycho-social immaturity, continue to apply to individuals into their twenties, even mid-twenties or beyond." Emily Buss, *What the Law Should (and Should Not) Learn from Child Development Research*, 38 Hofstra L. Rev. 13, 39 (2009).

Following his arrest, Rayquan and his mother talked – a lot. She told him where she was coming from, and he did as well. She is happy to have Rayquan move in with her upon release, far from his "friends" he was hanging around. Rayquan plans to spend his time in custody earning his GED and hopes to work on career involving repair and computers. He knows that at his sentencing, his mother and girlfriend will be the only ones there, and none of his "friends." For the first time in a long time, he is thinking about his future, and what it might become.

The Booker factors speak to the factor of rehabilitation as well as punishment. Here, a reasonable sentence at the low end of the guidelines followed by a longer term of supervised release will help make a better future possible. Despite being a category IV, Rayquan has never set foot in a prison, but instead did county jail stints. When he walks out of the prison, he hopes to do so with his GED, and plans to move in with his mother to work on his goals. He stands before this court, twenty-four years old, with a support system ready to help him when he finishes his sentence. A supervised release officer will work with him to get training

and education towards a career in repair and technology. While youth comes with bad judgment, it also comes with flexibility – and Rayquan has time to turn things around. It will take work, and help – but Rayquan has both, and he is ready.

## CONCLUSION

For the reasons stated herein, Mr. Rainey, respectfully urges this Court to  consider a low end guideline sentence or a significantly lower time in custody. Such a sentence will be reasonable and will adequately take into account the advisory guideline range and the factors set forth at 18 U.S.C. § 3553(a), resulting in a fair and just punishment.

DATED this 10th day of December, 2020.

Respectfully submitted,

DONNA LEE ELM
FEDERAL DEFENDER

*/s Nicole Hardin*
Nicole Hardin
Assistant Federal Defender
Bar#:0026194
400 North Tampa Street
Suite 2700

Tampa, FL. 33602
Tel.:  (813) 228-2715
Fax:  (813) 228-2562
Email: Nicole_Hardin@fd.org